0808 for Shutter People v. Darius Polk Both sides, starting with the epilogue. Amanda Ingram for Darius Polk. Good morning, Janet Mahoney on behalf of the people of the state of Illinois. Each side has 15 minutes. We hope you don't need to use 15 minutes on this one, not to denigrate the seriousness of it, but it's pretty straightforward. We've read the briefs, we're familiar with the record, so please both sides get to your strongest point. Any time you're ready. Good morning, Your Honors, and may it please the Court. I represent Darius Polk. I would like to focus my time today on the first two arguments from the brief, that the statement should have been suppressed and that an expert should have been allowed to testify in the area of false confessions. In order for a defendant to- If I may, I'm sorry. I'm Ms. Polk. I was looking at the Round of Four case. This is an extremely complicated case. You have as long as you wish in this case. Sorry about that. It's a real estate market. No, it's not a real estate market. This is an extremely complicated case. I had my- I had the one brief and then I had this stuff. This one is long, and so take your time on it. But I'd also ask you if- frankly, not to tip our hand, but we do talk, and in terms of your expert stuff, please make sure you cover the Miranda stuff, too, because that's very important in this case. But proceed. Okay. Thank you, Your Honor. In order for a defendant's confession to be validly admitted, he must understand and relinquish his rights to silence and counsel, and the confession may not be the product of inducements or coercion of any sort. In this case, Darius did not understand his right to silence, as that right was never explained to him. He asked for an attorney and the detectives coerced his confessions by, among other things, promising him that his friend would be released from jail if he confessed. Under these circumstances, the trial court's ruling denying the motion to suppress should be overturned. The recording of Darius's interrogation shows that when the- that the detectives did not simply read Darius's Miranda rights, but rather expounded on them in a confusing manner. When that- when the detective asked Darius if he understood the right to silence, Darius shook his head no. Well, we've looked at that, and of the three people that have seen it so far, two would say that I can't tell, and one said that he shook his head yes. Now, the next thing he says, the copper says, is, okay, I'll explain it to you, which would indicate he indeed did negative- give a negative connotation. But I would suggest the video isn't nearly as clear as we- as could be. But go ahead. Well, I think- I think Your Honor is right, that the detective's response is the clearest indication that he- it was a no- a negative indication. Otherwise, there would have been no need for the detective to say, oh, well, in that case, I'll explain everything to you. The detective's response is- is the clearest indication that his nodding of his head was, in fact, a no answer. And when the detect- and when the detective said he would explain it, he, in fact, never did. He told Darius that any statement he said could be used against him, but he never said that he didn't have to say anything at all, which is- is the- the crux of the right to remain silent. The- the only other time that the detective mentioned the right to silence was- was a few minutes later, when he kind of talked about all the rights together in- in sort of a summary fashion. And he said, do you understand those rights? How old are you? He didn't give Darius an opportunity to say yes, no, or otherwise, because Darius immediately gave his age, which was 17. He didn't give Darius an opportunity to say- to say yes or no. And those were the only two occasions indicated by the interrogation video- or DVD that the right to silence was ever mentioned. There's nothing on the video indicating that he actually understood his right to remain silent. Other than he did talk, you did cite in a supplemental authority, Burgess, which we have, but thank you very much. It's always appreciative. We appreciate when you get that done. In the last term, the U.S. Supreme Court, in a case called Florida v. Powell, looked at Miranda warnings, where the police in Florida, at least this policeman in Florida, read two warnings. Now, there are five, but apparently in Florida, his FOP book puts it in two really long sentences. And it's obviously compound sentences. And they found that to be enough. When you read these things, you don't examine them as if construing a will or defining the will. You examine them as if you're trying to find out whether the warnings reasonably convey to a suspect his rights as required under Miranda. I think that's definitely the question here, is were these warnings reasonably conveyed to Darius Polk? I mean, the way that the detective gave the warnings was, especially with regard to the right to counsel, was in a negative manner. In a way, he really perverted that right by saying, you have the right not to have an attorney. You can talk to me without an attorney if you want to. And although that's true, it's clearly a manipulation of the Miranda rights, where the actual right is you have a right to an attorney, to not talk if you don't want to. And there's nothing on the record to indicate that, regarding the right to silence, that even if it was given, there still has to be some understanding of that right. And that's simply not shown on the record here. Now, what's your best case for that, though, that there has been an affirmation by the suspect, yes or no, or I do understand, I don't understand? I don't think there has to be. There doesn't have to be an affirmation. But I believe it's a Rodriguez case that says you have to look to the totality of the surrounding circumstances. And I think the totality of all of the circumstances in this case point to a lack of understanding, especially when, as it shows on the video, the detective responds to that head nod as if it is a negative answer. And I think that, you know, we have to take that the detective interpreted that as a no. There's no reason for us or this Court to interpret it as anything else. Counsel, I'm particularly concerned about the standard of review in this case. The Court made certain findings. Specifically, I think the Court found that the defendant was advised of his Miranda rights. What I need to know is, was the Court basing its finding on the videotape, which I think the parties agreed to admit into evidence, or was the Court basing that finding on the testimony of the people who testified at the motion to suppress? I believe the Court did view the videotape when ruling on the motion. Okay. So if the Court's findings were based on the videotape, what's our standard of review? We can look at the same videotape. Is it de novo, or are we supposed to consider the manifest weight? Should it be based on the manifest weight of the evidence? Well, I mean, I guess, you know, it's not a de novo review. It would be more of an abuse of discretion review. But in that case, I mean, the defendant... Well, if there's a manifest error. If the judge's ruling was based on, was manifestly erroneous, then yes, I think this Court can, you know, can... But let's just go back. The parties agreed to admit the videotape in evidence. So there's no question about whether or not this evidence was properly admitted. It's in evidence. What I want to know is what the judge considered when he made those findings. Well, the judge definitely did consider the videotape. But my suggestion is that the judge's ruling was erroneous. Because, in fact, when he was talking about the right to remain silent, he actually referred to a part later in the interrogation when the detective was asking Darius about when Darius later asked for an attorney. And he said, do you remember your rights? I read them to you. And he was talking about the right to counsel. He wasn't referring back to the right to remain silent. So the judge, in effect, was looking toward the right to counsel and applying it to a waiver and understanding of his right to remain silent. But he was basing it on his viewing of that videotape. He was. Yes, he was. Regarding the right to counsel, as I said before, the detective gave these rights in a confusing manner. He didn't say you have a right to an attorney. He said you have the right not to have an attorney. You can talk to me without an attorney if you want one. He made it seem as though this was a positive thing, that he could talk to the police and give a confession without an attorney. And then later, when Darius said, I want to try to get me a lawyer, the detective did say, do you want a lawyer, yes or no? And although he was asking Darius for a yes or no question, Darius asked when he wanted to call his aunt to see about getting a private attorney. And he told the detective, I don't want the attorney that you're going to get me. Did he say see a private attorney or see if she can get the cash? Well, he said he wanted to try to get a lawyer. And then he said, I want to see if my aunt has the money to get an attorney, indicating a private attorney. And when he said, I don't want the attorney that you all are going to get me, the detective said, I'm not going to get you anything. So even though Darius had earlier been told that he would get an appointed counsel, the detective later said, hey, I'm not going to get you anything. And he didn't clarify that by saying your appointed attorney is going to come later by a judge at court. He just said, I'm not going to get you anything. So what's Darius left with? He's left with this detective saying, you can't have, you're not going to get an attorney. And you're not going to get to call your aunt to see about getting a private attorney until you confess. I mean, when Darius said, I'm going to try to get me a lawyer, the detective knew what he was talking about. The detective knows the rules. He knows Darius is being videotaped without his knowledge. And there's nothing that should have kept that interrogation going beyond that point. Let's start with that first, then, the idea he doesn't know. Can you cite a case with a proposition that when these police departments put in these 24-hour-a-day tapes at the order of the state legislature, at the behest of the Chicago Tribune and the Criminal Defense Bar of Cook County, and they put these things in against their wills, they fought it for literally decades and decades. So now that they do it, that violates a defendant's rights. Is that correct, by having it on? No, I'm not saying that at all. I'm not saying that that... Oh, sure you are. It's in the brief, and you just said, and he didn't even know he was being videotaped. Is that a violation of his rights? Do they have to advise him when they put him in an interview room, by the way, you're being videotaped? No, I don't think that's the case at all. I don't think the defendant has to know that he's being videotaped. But I do think it puts a little, a different flavor, I guess, to what happened. The detective knows they're being videotaped. Darius doesn't know what's being videotaped. He doesn't know he's being videotaped. So when the detective goes on and on saying, you know, yes or no, yes or no, he knows it's because he's being videotaped, and someday somebody's going to look at this videotape and want to see whether Darius did say yes or no. But the other side of that is, you know, Darius doesn't have any idea that he's being videotaped. But the point is that the detective manipulated the Miranda right of the right to counsel, and then told him he wasn't going to get anything, and then told him that he wouldn't be able to call his aunt for a private attorney until after he confessed. Well, the state cites Christopher Kaye, a very recent Illinois Supreme Court case. And in Christopher Kaye, they said an older case, a case called Evans. And in Evans, the question was, the film review assistant from Cook County is talking to a guy in a lockup, and at that time, the court reporter is there, and it's a court reporter's statement, back before we fooled poor defendants by having them being videotaped. And the question was this. He reads him his rights. He says, you have a right to a lawyer. And it's a pretty sharp defendant. He says, you mean I can have a PD here, or do you mean I have to wait? He's knowing. He's a smart fellow. He knows that if he's going to be a public defender, he has to wait for the bond hearing. Or can you get one out? And that's the question. And it goes on. So the state says, well, if you want one, I'll quit talking to you, and we'll go get one. And then so later, we can get time to get a PD, right? The defendant, we can take time to get a PD, right? And the Illinois Supreme Court, in Evans, mentioned in Christopher Kaye's case that that's not an invocation of an attorney at all. It's not. Now, I would agree with you. Had you told me six months ago, here's the fact scenario, somebody asking Evans, you can get me a PD, right? That's an invocation. To me, it's English. To me, it's an invocation. In this case, where the defendant's, probably 17 years old, says, I'm calling my aunt to try and get me a lawyer. Is that an invocation? I would have said, that's an invocation. It's in English. How can it not be an invocation? But every case that's cited on invocation has said it's not an invocation. The only time there's an invocation is when they say, I refuse to speak to you. I want a lawyer. Apparently, that is an invocation. But nothing else. So if you can cite a case or cases on your proposition, I suggest we're from Smith v. U.S., where a guy says, yes, I want that. I want an attorney. That's an invocation. But there's five or six cases from our Supreme Court saying these are not invocations. It really has to be, I want an attorney. I will not speak to you. Well, I would just remind her that the assertion of right to counsel doesn't have to be absolutely articulate. There does have to be some indication for a desire to counsel. I mean, there's areas in this area, and certainly there are many occasions where the Supreme Court hasn't found an invocation of the right to counsel. But I would suggest that in this case, under all the circumstances, where Darius's right was told to him in a negative fashion, where he expressed a desire for an attorney, and where his request was met with, you can't call anybody until after you confess, I would say that that was a violation. But I think what's more to say... But going back to not calling people, they did everything they could, didn't they? I mean, in terms of the record, the judge made a finding. He wanted one aunt, and they couldn't find the aunt. They let him use my phone. He says, use my cell phone. And they couldn't find it. So he sent out a squad car and couldn't find her. Then he said, well, if you can't find the aunt, can you find my second aunt? And they went out to her house. They couldn't call her. They couldn't reach her. She was at work. And apparently there's no questioning, but they did. She was at work from 4 to 12, and she couldn't do anything until after 12. But they did. They did make an effort to find his aunt. But if, in fact, this was an invocation of the right to counsel, then that's when the questioning should have stopped, whether or not they could find his aunt. I think what's also disturbing about this case is that over the period of the interrogation, the detectives used multiple manipulative tactics in order to extract a confession. Not only did they repeatedly tell Darius that everything would be fine if he confessed, they told him he wouldn't be judged. They also asked him to confess and that they would release his friend, Sean Wooden, who was not only his friend, but was also his girlfriend's brother, who happened to be a four-corner hustler and was also confined to a wheelchair. They told Darius before he came in that Sean wasn't happy about having to come in. And then after he came in and apparently did not corroborate Darius's alibi, Darius asked about him. And the detectives said over and over again, we'll let him go if you talk. Just tell us what happened and we'll let him go. We'll wheel him out of here. When finally Darius caved in, they followed those offers up with repeated promises. Not just offers, but, you know, promises. I promise you, we will let him go if you just tell us what happened. Just confess. So your suggestion then is that Darius felt so bad about his crippled gang member pal that he implicated him to send the alibi. I was with Sean. And so they bring, pick up Sean. They bring him in to say, I was there with that guy that day. That he felt so badly about that that he then felt compelled to say, if you let Sean go home, I'll confess falsely to this crime. Well, I think that's absolutely possible. I mean, this was at the end of several hours of interrogation. He'd been repeatedly told, like, hey, just tell us what happened. Everything will be fine. Everything will be fine. Can he not say that? He did say that. Is that wrong, though? Are you supposed to tell him, why don't you confess and I'll give you charge of murder and then you'll get 50 years of real time and you'll die a miserable death in prison. Are they required to say that? They're not required to say that. But I think when you're looking at whether there were improper inducements and that were, that made the confession involuntary, I think that's one of the things that you can look at. We're not looking at one instance of the detective telling a lie or just fluffing up his story a little bit. There were no lies, right? There was a lie. They told him that they saw him on the pod camera near the same car. Okay, well, they saw the red car, apparently. So there was one lie and there were multiple instances of him telling everything will be fine. And whether or not that's, I'm not saying that that single instance of him telling him that it would be fine when really it's not going to be fine. But the overall circumstances combined with repeated inducements to let his friend go and this is somebody that, you know, must have some sort of emotional connection to Darius. I mean, this is... Well, he said, I was with my buddy and there was apparently, he later said that was a lie about, I lied about my alibi. So he felt so bad. Now, most of these in terms of inducement are you have the mother going to be charged and say, we're going to take your children away forever unless you tell us what happened. And for fear of losing her children forever, even often they'll say something. That's just how life works. And that should be readily condemned. But to say, I'll get your friend out of the area five, once we're done talking to you, see what your involvement is, I kind of suspect, why does he feel that? I think to a 17-year-old person who's dealing with somebody who's older than him, who's his girlfriend's brother, who's a gang member, I mean, that might be a very, very serious situation for Darius. He might be fearful, right? He might be fearful. So the question is, Darius might be serious thinking, this gangbanger, even though he's a cripple, he's a four-corner hustler. I'm not a four-corner hustler. If I don't get him out of area five pretty soon, he's going to whack me or he's going to hurt me in some way or hurt my family in some way. So he's really afraid of, afraid of Sean. That's possible. He's not going to have to be nice to Sean. He's afraid that Sean's going to do something bad. Right. Well, and also, there are other cases. I know I've cited the member of my brief. I think the names are Coaster and another one. But it doesn't even have to be something regarding an emotional relationship, like a mother and a child. Or it can be, hey, you confess and I'll talk to the state's attorney, get you a good deal. It can be any inducement is going to be improper. And this was not just a single, this wasn't just a single promise of lenity or anything like that. This was something of value to Darius. And even if we don't consider it something of value, it was something of value to Darius. And it worked because after the detective said, hey, let him, you know, you tell us what happened and just, well, we'll let him go. It worked. And he confessed. But they didn't tell. You indicate in the record that Darius had a low IQ and that he didn't go very far in school. How did those two facts influence the way he acted in that interview room that day, if at all? I mean, I think the interview, you know, shows that he is an unsophisticated person. He's not very literate. Well, the state maintains he was very conversant. Well, I mean, I guess that is a matter of interpretation. I mean, my interpretation of the video is that he's an unsophisticated person. He, I mean, he is conversing with the detective. I mean, he's not, you know, he's not, you know, as limited as some people. But he certainly does have limitations. And clearly if he's, you know, he says he doesn't understand the right to remain silent, he asked him to repeat, you know, one of the rights. You know, he did seem confused. At one point, the detective said, even told him, hey, you're hemming and hawing. You're hemming and hawing. And he said, ask anybody. I do that all the time. I mean, he wasn't, you know, the most articulate person in the world. How far did he actually go in school? How far did he go in school? I think he maybe went to like ninth or tenth grade. But I believe he was reading at a second grade level. So he was socially promoted until he dropped out. But coming back to what Justice McCullough just asked you, at page six of your reply brief, you point out the state. So the state asked this court to overlook evidence of Darius' IQ and reading level. Because those were not brought out to the motions of press. So they weren't, the trial court rules on emotions wasn't aware that he had an IQ of 70 or an area of 70 and had a third grade reading ability, right? That's true. Well, I mean, it is still part of the record. But even if this court doesn't consider those factors, I mean, there are many other factors that strongly indicate that the trial court's ruling is erroneous. How did they come in then, though? Was it through the other factor? They came in at trial through the expert. That was allowed to testify. Well, that particular one was allowed to testify. Moving on to the second, if there are no further questions on the Miranda issue. The trial court erroneously denied defense counsel's motion to allow an expert in the area of false confessions. An individual is allowed to testify as an expert if their experience and qualifications afford them knowledge which is not common to laypersons and where such testimony will aid the trier of fact in reaching its conclusions. An expert need only have knowledge and experience beyond that of the average citizen. In this case, the defense wished to call Dr. Richard Leo in the area of false confessions. He holds numerous degrees, studied police interrogation techniques, and is a published author on the subject. At the time of Darius's trial, he had testified. He's a lawyer, right? Is he a lawyer? He is a lawyer. Okay. He had testified as an expert nearly 100 times at the time of Darius's trial and neither the state nor the trial court ever disputed his qualifications as an expert. Rather, the court denied the motion based on its belief that the jury could decide the weight to give to Darius's statement. However, because Dr. Leo met the standard for an expert, that is, he had specialized knowledge which would have aided the jury in its determination of facts, he should have been allowed to testify. Interviewing techniques that create risky environments for false confessions are outside the realm of ordinary knowledge. Although several jurisdictions have recognized this area as an appropriate area for expert testimony, the strongest indication in Illinois that this subject is appropriate for expert testimony is that the state's attorney's office provides special training for its prosecutors to recognize the risk of false confessions. So under your theory, then, the trial court should have allowed Dr. Leo to testify as a California lawyer who's done studies of false confessions because he knows a lot about false confessions, and then the state or the defense, I suppose, could call Bob Mylan, who you recite his articles and his training methods at the state's attorney's office, and say, oh, no, I'm very familiar with false confessions, too, and this isn't a false confession, and what these coppers did would not lead to a false confession. No, not at all. Neither expert would be able to testify as to whether Darius's confession was, in fact, false or not. I mean, certainly an expert such as Dr. Leo would be subject to cross-examination, and the state could bring its own competing expert, but no expert in this area should be allowed to testify whether, in fact, the confession was false or not. This wasn't about telling the jury one way or the other whether it was false. It was simply about explaining to the jury, giving the jury knowledge about what sort of risk factors are recognized within false confessions. It wouldn't have had anything to do with telling the jury one way or the other. But wouldn't he have to testify to be worth anything, Leo or Mylan, to testify that these are the risk factors, and you cite them in the brief, and those risk factors were present in this case in these forms. So in this case, the inducement, as you said, the length of questioning, the age and IQ of the suspect, he'd have to say that, wouldn't he? Otherwise, in general, there are such things as false confessions. He'd have to testify how this case fit into his theory, wouldn't he not, without reaching perhaps the ultimate thinking, oh, and by the way, I think it's false. Well, I mean, I think certainly the reason that this expert should have been allowed is because those factors are present in this case. Because there are inducements, a lengthy interrogation, a young defendant, and so on. But I don't think necessarily that the expert would have had to testify, you know, pointing out exactly where he thinks these risk factors were. But definitely the jury should have been allowed to know this specialized knowledge, and have the tools to aid them in their determination. You know, with obviously a cross-examination, you know. I'm sorry. You're very kind to stop. Dr. Leo, though, his doctorate is in jurisprudence. Sounds to me like the Wizard of Oz with Thinkology. So he's got a doctorate in jurisprudence, and in McCown, in this last few months, the state of Illinois Supreme Court said that law enforcement is not a scientific field. Therefore, general acceptance within law enforcement is no grounds to let in testimony. So why would jurisprudence then be any different than law enforcement? Well, it doesn't just have to be a degree. I mean, a person can be an expert based on their experience, based on their knowledge, based on their work history. I mean, there are many other kinds of specialized knowledge. I mean, gang experts can come in. They don't have a degree in gangs. You know, narcotics sales experts come in. They don't have a degree in narcotics sales. And the most analogous sort of testimony would probably be eyewitness identification testimony. And in those cases, that's never been considered to be anything other than specialized knowledge. And it's also never been allowed in Illinois other than on a bench trial about two years ago. And so the cases are legion in affirming the denial by trial courts of admitting experts in to testify by eyewitnesses. They are. I don't know the science. I'd suggest you support your argument that, yeah, it's really hard to identify somebody credibly. Well, it is. But, I mean, with regard to the eyewitness identification cases, for example, in People v. Innis, the court did affirm the denial of the expert in eyewitness identification. But the reasoning for the court's denial of that was because the risk factors for a mistaken identification, such as a stressful scene, the use of a weapon, things like that, weren't actually present in the facts of that case. And there have been other cases where the court has said there has to at least be a meaningful inquiry. There has to be some sort of balance between the probative value and the prejudicial value of allowing this expert to testify. Although there are cases going against it, it's not because it's not allowed. It's simply because the court has found that after a meaningful inquiry, the court didn't abuse its discretion. And in this case, there really wasn't a meaningful inquiry. The court didn't really balance the probative factors against the prejudicial factors. How is that? Well, because his ruling was simply based on his idea that the jury could decide it for itself. But this is specialized knowledge. No ordinary person would ever have a reason to encounter a false confession in their everyday life. I mean, and also the fact that states' attorneys who are already highly specialized attorneys, if the former first assistant state's attorney is publicly advocating that additional training is needed to point out these factors because they're so counterintuitive, that's a strong sign that this is outside the realm of ordinary knowledge. And the trial court's finding otherwise is simply wrong. Well, but going back to your analogy then, though, since there's literally not a case in Illinois that is reversed, which is what you're asking us to do. You're asking us to reverse this trial court's ruling on admitting the expert's testimony. And every case that is looked at just on the analogy, the strong analogy of eyewitness testimony, says absolutely not, it's not reversible. We refuse to reverse it. That's a tough road to hoe for you. It is, but it's not, as I said, it's not because it's not allowed. It's simply because the court has conducted an analysis and found one way of the other way. This is, in many ways, a case of first impression. It has not been exactly decided, but this court can look to Ennis and see when is an expert allowed, when there's specialized knowledge, when it will aid the jury. Both of those factors are present here. Counsel, when this witness was getting ready to testify, there was no, and the evidence was excluded, there was no offer of proof made so we'd know exactly what Dr. Leo was going to say. Is that correct? Well, he did make an offer of proof. He included his resume. No, I mean about what the testimony was going to be. Not what the testimony was going to be. It didn't get that far. But I would suggest that that would be very helpful when we're reviewing this. Justice Quinn has pointed out that the cases are pretty clear that that evidence if that evidence is excluded, it's not an error upon which this court should reverse. So it would be helpful for us to know what this doctor was going to say. I think in defense counsel's motion he did include Dr. Leo's report and his resume and I think that report does give guidance as to what his testimony would have been about. A confession is the most powerful piece of evidence that a state has. In this case, Darry should have been allowed to fully attack that evidence with the appropriate resources that were available to him that his defense counsel wanted to use. But they did let another expert testify, right? The psychologist that testified about his low IQ, his third grade reading level, his problems in schools. They did let that expert testify, but that's a different subject matter. That simply goes to his intelligence, his IQ, but that's not the same. That's looking to Darius. That's not looking to what the detectives did. I mean, Dr. Leo's testimony would have been more looking at what the detectives did, not about anything having to do with Darius's personal limitations or suggestibility or anything about that. This is about objective risk factors employed by the detectives. This isn't something that the expert in psychology would have had any expertise in. That being so, and again, there's no suggestion while you do alleged coercion based on the length of time, the fact they do say we'll be here all day, we'll be here all night. That's the coercion alleged here, right? It's not that they threatened him, they didn't raise their voice from watching the DVD. You can tell. I mean, he's sitting down there leaning against the wall. So there's no, even a threat of physical coercion here. That being so then, wouldn't Dr. Leo or other people like that be able to come in and testify in every single case in Cook County where there's a videotaped confession and say, well, they shouldn't have asked that question that way. No, your honor, not necessarily. Not necessarily. I mean, the risk factors are a false confession. Maybe they're sometimes present in interrogations, but an interrogation doesn't always result in a confession. The state might not choose to use a confession in every single case for one reason or another. There's no the only time that an expert should be allowed in a case like this is when those factors are present and when defense counsel wants to present that testimony. This isn't going to open the floodgates to all of a sudden we have experts in every case. But we write for the whole world, so we'll, as you point out, it's a case of first impression. So we'll be the only court in Illinois, every court in Illinois will follow whatever we say, and so if we say that this judge violated this defendant's rights by not letting a Dr. Leo testify in a confession case, I'd suggest that every judge would have to say, not in every case, but the vast majority of them, to say, well, then I better let this false confession argument in with expert testimony in every case the defense chooses to bring it up. For fear that a panel like us would reverse that. Well, your honor, it's better to have this kind of information at the trial level rather than at the appellate level or PC level or anywhere else. I mean, if there are factors that are present in a case and an expert could speak to those factors and educate the jury, that's not anything to be afraid of. That's giving the jury more tools so that the state can get more accurate convictions and that the defense can fully defend himself with the appropriate resources. Let's go back to what Justice Neville asked you earlier about this is a very different case. This is the first case I've come across in 14 years up here where every interview the defendant is on videotape. So there's no allegation here that the police did not feed him any lines. So at the end of the day, at the 17 hours when he says, yes, I walked up the street, I saw the two people I wanted to shoot, and I shot them. There is no allegation that this was fed to him because everything that was said to him was on videotape. If I could only clarify, actually, your honor, the facts of Darius' confession don't actually match up with the actual facts of the case. He confessed to shooting one person. He never mentioned that there was another person there. So the facts of the case. But he names the victim, right? I was looking for him because he threatened me earlier in the day. He does name the victim, and I'm not suggesting that that particular fact was fed to him. But I think there's still, you have to look at the overall circumstances of this case and you look to the length of the interrogation, his age, IQ. But you also need the details of the confession, right? Joe Blow is dead, was shot, allegedly by Mr. Polk. Mr. Polk says, you know what, on that day, officer, I walked up to him on that day and I shot him. That's a pretty good detail. Would a normal person think, gosh, that's pretty interesting reliability. He didn't say he shot some other guy. Well, I would just clarify that the person he admitted shooting was not the person who died later from the wounds. He was, he admitted to shooting the person who lived. So based on his confession, he doesn't even know he's, he knows there's a shooting, but he doesn't know that there's, that it's actually a homicide. And he certainly did not admit to a homicide. He admitted to a shooting. If there are no further questions, I'll. We have time for a reply. Are you going to stand on your brief with respect to the other issues? Yes, your honor. Thank you. State. Good morning. Again, Janet Mahoney on behalf of the people of the state of Minnesota. Dr. Leo was not testifying based on specialized knowledge. Dr. Leo was holding himself out as a social scientist as he referred to himself several times in the report he submitted that was submitted to the court. Dr. Leo was a lawyer and a law professor who did not, who was not involved in any of these interrogations. There is no specialized knowledge there. Simply reviewing records of something that was done somewhere else, secondary records, does not make, give you specialized knowledge. Perhaps Bob Mylan has the specialized knowledge. Dr. Leo does not. He also is not a social scientist. So the court was absolutely correct in denying the request to have Dr. Leo testify in this case. Well, why wouldn't we treat it like a gang expert? Very well thought of on their feet. Gang experts testify all the time. What do you know about the vice lords? Well, I know everything about the vice lords and they run this territory and they're in charge and they do that all the time. And their gang experts are police officers who are out on the street. It's not a law professor sitting out in California in his office reviewing records. It's not somebody who hasn't been involved in interrogations on a regular basis. It isn't somebody who knows the subject personally. It's just a cold, hard record. He's a lawyer, he's a law professor, and he's holding himself out there as a social scientist. If you were to accept him as an expert, anyone who's a lawyer is going to be able to testify on police interrogation techniques and false confessions. Police officers acquire all this experience by being involved in a number of investigations. This law professor is out in California, he looks at a lot of cases, and he starts coming to conclusions. He doesn't acquire specialized knowledge, but the police officers who are involved in all these investigations do. First-hand knowledge for the police officers, second and third-hand knowledge for the law professor. It's not his area of expertise. He's a law professor. He's not an interrogator. He's not somebody who's tested people to show, hey, when you ask somebody a question this way, X number of people come out with this kind of answer. He's not the social scientist that are held out as experts in other types of cases. He's a law professor. His testimony also was irrelevant. He didn't examine the defendant. He didn't talk to the detective at all. He failed to acknowledge that the information the defendant was being confronted with was actually accurate. So according to Dr. Leo, you can't confront a suspect with accurate information and say, you know what, we don't believe you. Because according to Dr. Leo, whatever the response is, that led to a false confession. That was tricky. That was manipulative. And that simply isn't true. He failed to acknowledge that. But that's not why the judge refused it, right? He refused it because this is uncommon knowledge. Everybody knows about this stuff. He refused it because it was irrelevant and that the jury could decide on their own without expert testimony. So he did consider the relevancy of it. And also, what Dr. Leo wanted to present here, the jury could decide on their own. They had the videotape. Best evidence in the world. They could look at it. They could hear the tone of the voice. They could see the response the defendant was giving. They could see the way they treated him. And in this case, they were nothing but courteous to this defendant. Counsel, you're of the opinion that the average juror is informed about how defendants are induced to give false confessions? The average juror can see the way the question and answer session went. And everyone can notice when somebody's being manipulated. If it's a simple question and answer session, as what was happening here, with being confronted with true facts, yes, everyone in the world can decide whether the response was false. So you're saying because the jurist could examine or look at the videotape, they could come to their own conclusion? In this case, they could come to their own conclusion. There was nothing outrageous about the situation here. They were kind. They were courteous. They were respectful. They gave him time. They were looking for his aunt. They did whatever. They were responding to him in a proper way. They weren't manipulating him here. And they could look at that. So to understand your position, the jurors didn't need Dr. Leo to assist them in evaluating the video. Correct. That's your position. Correct. Absolutely. They did not need him to assist them. The officer also testified. They heard the testimony from the officer. The videotape plus the officer, the jury can decide. This is for the jury to decide. This isn't for Dr. Leo to come from California from his law professor job to come in here and talk about how the Chicago police officers performed on a videotape and something that he didn't even acknowledge that they did correctly, which was confront him with false information. The jury was perfectly capable of handling this. Can you address the Miranda invocation? Would you like to address the right to remain silent or counsel first? I'll follow. Okay. Let's start with the right to remain silent. First of all, the standard was that the state had to prove by preponderance that the defendant waived his right to remain silent. Defendant understood his right here and you look to the conversation as a whole. You don't look to just one snippet in time to decide whether he understood this right or not. And if you look at the conversation as a whole, combined with the officer's in-court testimony indicating that the defendant understood his rights, it's clear the defendant understood his right to remain silent. It was read to him several times. With the possible exception of the first time, defendant never indicated that he did not understand his right to remain silent. He engaged in a conversation with the officer about his right to counsel. He wasn't afraid to ask questions about his Miranda rights and the detective wasn't afraid to provide answers to the defendant about his Miranda rights. His active participation in the Miranda-type conversation about his right to counsel, combined with the fact that he never asked any questions about his right to remain silent, taken as a whole, indicated he understood this right and he waived it. And how about the invocation? And as to the invocation, I'm thinking about talking to my aunt or I want to talk to my aunt because I want to see if she has money because I want to see if maybe I can get a lawyer. That's not an invocation of a right to counsel. Well, of course, that's not the order that it went in. And this is at the 22 of the year brief. So you're talking about the aunt. Defendant, yeah, so I can talk to her. Detective, about what? Defendant, about why I'm here. Detective, I just told you why you're here. Defendant, I'm going to try and get me a lawyer. Do you want a lawyer? Defendant, I'm just going to see if she got the money for it first. And it goes on. Perfect. I'm going to try to get me a lawyer. It's not an invocation that he's going to try and get a lawyer. Do you want a lawyer? I want to see if she has some money. I want to see if she has some money. And then the conversation continued to, you don't need money for a lawyer. Well, I don't want a lawyer that you're going to get me or the judge is going to get me. I want a lawyer that I'm going to pay for, but I've got to see if I have the money first. And the detective says to him, if you want a lawyer, this conversation is going to end. And there was nothing more. Nothing more. So that's very, that's equivocal. That is not unambiguous. That is not an invocation of a right to counsel. Interestingly, the aunt that he wanted to call, he didn't know her phone number. But Sean, his alibi witness, he said, you can find her phone number in Sean's phone. Why is that interesting? I find that interesting because what's going on here? You bring in this alibi witness, he doesn't support your alibi, and now you want to get a phone number out of his phone? What does that mean to you? It doesn't mean anything to me. It doesn't mean that he's looking for a lawyer. It means he's looking for his aunt. He's looking for somebody. And when they did contact an aunt, the aunt that he was trying to contact, she informed the police, does not have a cell phone. Wouldn't he look for his aunt if she's going to pay for the lawyer? It seems reasonable to me. She's going to pay for the lawyer. Not if she doesn't have any money. Well, we don't know that. He said, I have to see. Right. So I don't, it's not a clear indication of a right to counsel. I'm going to see. I want to think about it. Maybe if we have money, maybe I'll get a lawyer. Do you want a lawyer? Do you want a lawyer? Because this ends now. So when you read the statement, I'm going to try to get me a lawyer, that doesn't mean to you, I need a lawyer. No. What does that mean? That means if I have some money, I'm going to get a lawyer, maybe now. It doesn't say anything about money. I'm going to try to get me a lawyer. That means? Do you want a lawyer? I'm just going to see if she got the money for it first. But we're just talking about the unequivocal, unambiguous invocation of the right to counsel. The man says, I'm going, going to try to get me a lawyer. Try. So, try. Right. Try. Try. Because he understands that private counsel requires money. So it's going to be a try. But he says, I'm going to try to get me what? A lawyer. Equivocal. Try. If we got the money, because then he went on to say, I don't want a lawyer from you, which means that he doesn't necessarily want a lawyer. I might not want a lawyer because I just don't want any lawyer. I just don't want any lawyer. But you know what? You have the right to a lawyer. Do you want it? Yes or no. But he says, I don't want your lawyer. Wouldn't he be talking about the public defender? And then it was clarified, not one that you're going to get me. I mean one that the judge is going to get me. Well, then he doesn't want a lawyer. He doesn't want one. So you're saying that reasonable people can't differ. This is an ambiguous, equivocal statement. Absolutely. And the officer did what was necessary to determine whether it was equivocal or not equivocal. And he continued after that because to this officer who was being reasonable, this was equivocal. Let me ask you a question, counsel. I ask your opponent. The parties agreed to admit the videotape into evidence, correct? Did you agree to admit this transcript of what was said into evidence? I believe the transcript is People's Exhibit Number 3 was admitted into evidence. Not the transcript that is also part of the common law record, which was the transcript that was provided by the defendant, but I think it's People's Exhibit Number 3 was admitted into evidence. There is a transcript that's admitted into evidence. Correct. Alright. Do you know what the judge used when he made his findings? Did he just look at the videotape or did he base it on the credibility of the witnesses? Or do you know? Well, the judge would have based it on live testimony that was presented to him. You can't present it and then pretend like it didn't happen. He heard the police officer testify about these facts. But did he look at the videotape? He also looked at the videotape. Yes, he did. And the review here then is for manifest error because this is the appellate court, not the trial court. The trial court saw the video and the police officer testify. But what was the judge doing? Was it credibility that he was weighing or was he looking at the tape? We can look at the tape as well as the trial court can. Oh, credibility. Absolutely. So I need to rely on what the judge says when I try to figure out what the defendant meant when he said, I'm going to try to get me a lawyer. I need to consider what he said, what the judge found. You review whether the judge's finding that that was equivocal is against the manifest weight of the error. You cannot go on your own fact-finding mission here and review the videotape and come up with your own conclusion. You have to review the judge's decision and whether the evidence in the record supports that decision. He had the benefit of also listening to the police officer testify in front of him. I read the defendant and his rights. He understood them and he weighed them. So you feel the standard is manifest weight? Correct. As to the voluntariness of this confession, counsel mainly focused on the fact that the defendant was somehow promised that they would let Sean go if he confessed. Sean's release was contingent upon the results of the investigation and the results of the investigation in part were contingent upon what the defendant had to say. They weren't going to let him go as like, hey, gee, thanks for confessing today, now we're going to let your buddy go. It was, if Sean's not part of this, we're letting Sean go. The defendant's the one who had involved Sean in this case and they kept saying that to him. Listen, you're the one who brought him here. And then we talked to him and he doesn't support your alibi. But meanwhile we picked up some other evidence and we may think that Sean's car was in the area of the crime at the time it committed. We can't just let him go. They don't quite explain it that way, right? They say we saw a red car on a podcast, we saw you in that area on one of our blue light things, right? We believe we saw a red car and we believe someone who looks like you was in the area of the crime. Not, it's absolutely you because if it's absolutely you, why are we here? I mean, if they've got that camera showing them there. Well, actually, bring that up. Why are they here? Because it's their job to investigate crimes. And there's no state's attorney's involvement in this case. Which is odd. Normally after this, as I understand the theory behind this, you have the confession and they call for an interview and they come out and they take a confession as well to clear things up because they're pretty sharp guys. We don't have that here, do we? You don't know that. There's nothing in the record whether they were there or whether they were not there. You don't know if they were watching or not watching. You don't know if they were in the hallway or not in the hallway. There's absolutely nothing on the record with regard to that. So you can't assume that the state's attorney's office was not involved in it and you can't assume that they were involved in it. That's just the way the record is in this case. Unless this court has any other questions on any other issues? No. Thank you, Ms. Baum. People request that you affirm the conviction and sentences. Ms. Ingram? I just have a few points, Your Honors. And if I could start with the Miranda issue, then I'll move on to the expert issue. First, the state argues that Darius was told several times about his right to silence, and that's just not true. The right to silence was mentioned exactly twice in the record. At the first point, Darius nodded that he didn't understand. At the second point, the question was immediately followed with how old was Darius. And the state said, well, he's older than you, and he wasn't given an opportunity to affirm or deny whether he, in fact, understood. And secondly, the state makes the point that Darius never asked a question about his right to remain silent. Well, he indicated that he didn't understand. I mean, is he supposed to first nod, tell the detective that he doesn't understand, and then remind the detective that he doesn't understand? He did enough. The detective knew he didn't understand and didn't do anything about it. Secondly, regarding the right to an attorney, the state is using post-invocation statements to justify the violation of his right to counsel. Smith v. Illinois clearly holds that you cannot use subsequent statements to render the original invocation ambiguous. He said, I'm going to try to get me a lawyer. He didn't ask. He didn't say maybe I should get a lawyer, maybe, might, should. He didn't ask a question. He didn't use any words that might indicate ambiguity. He said, I'm going to try to get me a lawyer. That should have been enough to stop the questioning. So in your opinion, try doesn't raise the question of ambiguity? I don't think try is ambiguous at all. He said, I'm going to try to get me a lawyer. I mean, try indicates he's going to make an effort to do something. He wants a lawyer.  But as they point out, the very next question from Barr is, do you want a lawyer? I don't know what they're supposed to say. Do you want one? Well, according to Smith v. Illinois, that question shouldn't have happened. And furthermore, again, although he was saying, you know, answer yes or no, he also said, when Darryl said, I don't want the attorney that you all are going to get me, the detective didn't say, oh, that's attorney going to be later by a judge at a court. All he said was, I'm not going to get you anything, and you can call your aunt after you confess. I mean, nothing about this was in line with what should have happened. Well, what he's saying, and I agree with Justice Neville, he's saying, I don't want a government lawyer. I want what they would call in the world out there, unfortunately, a real lawyer, which unfortunately, Ms. Singram, is how this stuff works. The public defenders are excellent lawyers. They're great lawyers. And the only people that don't like them are their clients. They're much better lawyers, in my opinion, than the average criminal defense attorney, the private guy. They do it every single day. But when he says, I don't want a free lawyer, as he did in Evans, I don't want no PD, okay, then we'll just confess without one. Okay, I will. But that's not what happened here. All he said was, I'm going to try to get me a lawyer. He didn't say whether it was private or public. And when he said that he didn't want a public, it doesn't matter whether he wanted a PD or not. The question is whether he wanted a lawyer, and he did. Finally, with regard to the coercion, the state's argument is that Sean's release was contingent upon the outcome of the investigation. Well, maybe it was in the detective's mind, but that's not what was conveyed to Darius. I mean, what was conveyed to Darius is, hey, you talk, and we'll let your friend go. That was repeated over and over. I mean, the message that was conveyed to Darius was a quid pro quo. You do this, we'll give you something in return. It wasn't, well, we're doing an investigation here, and we can't let him go until we get to the end of our investigation. That's not the message that was given to Darius. Going to the expert issue, the state argues that this wasn't specialized knowledge, that all that Leo had to go on was the cold, hard record. But that's not true. He doesn't just have a cold, hard record, which indicates all he's got is a transcript. He's got a DVD. And he's not just some person sitting in an ivory tower in California. He is an expert in this area. He's testified over a hundred times as an expert. He's published numerous studies and reviews on this subject in peer-reviewed scientific journals. This isn't just some quack who's showing up to testify for whatever he's getting paid for. This is somebody who should be seriously considered and should have been more seriously considered by the court. And the other thing the state said is that any lawyer would be able to testify as an expert on this subject. Well, that's obviously not true. I mean, not every single lawyer is going to have published numerous authors, studied the records of numerous cases of false confessions, and had that kind of information. I mean, the idea that just anybody could walk off the street with a law degree and testify as an expert in this area is just not accurate. And finally, the idea that... There would be plenty of public defenders here to call. Andrea Lyon comes to mind. Lots of them. I mean, scores of them. There's nobody better at having battled over confessions than a public defender and ex-assistant. They've done scores of these cases. There's no shortage of experts if we were to say this is okay. Well, I don't think that just having a knowledge base or just being aware of this issue makes you an expert. I mean, there has to be something beyond, and that's what Leo has. He has actually studied records, dozens and dozens of cases of confirmed false confessions based on DNA evidence. This isn't just somebody who's aware and is interested in this issue. This is somebody who has actual in-depth knowledge of this issue. And finally, the idea that a detective could never confront a suspect with accurate information. Again, that's not true. This isn't about hamstringing detectives or getting in the way of their investigation at all. All this is about is giving the jury the tools to recognize risk factors for false confessions and having the jury decide what the outcome is. It's not about getting in the way of the police. This is all about the trial is a truth-seeking function. This will help juries seek the truth because it will give them more information and resources to make their factual determinations. Thank you very much for the excellent arguments, the excellent briefs from both sides. This case will be taken under revise. Thank you again.